## SOUTHERN COTTON OIL CO. v. UNITED STATES et al.

No. 54.

District Court, E. D. Louisiana.
Sept. 6, 1935.

Single, Atkins & Tyler, of New York City, and Rosen, Kammer, Wolff & Farrar, of New Orleans, La. (Horace T. Atkins, of New York City, and Edwin C. Hollins, of New Orleans, La., of counsel), for libelant.

Edouard F. Henriques, Sp. Asst. in Admiralty to the U. S. Atty., of New Orleans, La., and William E. Collins, Dist. Counsel, U. S. Shipping Board Merchant Fleet Corporation, of New York City, for respondents.

BORAH, District Judge.

This libel is brought by the Southern Cotton Oil Company in its own behalf, and on behalf of the Yokohama Fire & Marine Transit & Fidelity Insurance Company, Limited, against the United States of America and the United States Shipping Board Merchant Fleet Corporation under the provisions of the Suits in Admiralty Act of March 9, 1920, and the amendment of June 30, 1932 (46 U.S.C.A. §§ 741–752).

The suit has for its object the recovery of a sum of $296,801.59 which is the damage that libelant is alleged to have sustained on a shipment of 22,400 bags of Chinese shelled peanuts which were laden on board respondents' steamship West Eldara at the port of Yokohama on or about the 20th day of May, 1920, and which after encountering certain hazards not necessary here to relate subsequently arrived at the port of Savannah where delivery of the peanuts was made on March 2, 1921.

Heretofore, and on or about the .19th day of May, 1926, a suit upon the cause of action upon which this suit is based was commenced in the United States District Court for the Southern District of New York, which suit was dismissed for lack of jurisdiction in pursuance of the decisions of the United States Supreme Court dated January 6, 1930 entitled Johnson et al. v. United States Shipping Board Emergency Fleet Corporation, 280 U.S. 320, 50 S.Ct. 118, 74 L.Ed. 451.

On October 27, 1932, the present libel was filed in the Eastern District of Louisiana. A plea to the jurisdiction and a motion to transfer this libel to the United States District Court for the Southern District of New York, or to the United States District Court for the District of New Jersey having been presented and overruled, the respondents thereupon, with full reservation of their rights under the rulings made, filed their answer and supplemental and amended answer setting out numerous defenses; one of which, as set forth in articles XV and XVI of the supplemental and amended answer reads as follows:

"XV. Respondents specifically allege as a bar to this libel, that between the 1st day of August, 1922, and the 29th day of May, 1923, negotiations were had between the libellant and the respondents for the purpose of settling and compromising claims, or alleged claims, of the libellant against the respondents arising out of the operation of vessels through the United States Shipping Board. The said negotiations were commenced, at libellant's request, with discussion of an alleged claim asserted by libellant against respondents in connection with a certain shipment of cotton seed oil made on·the SS Nonantum. Thereafter, at libellant's request, the discussion was extended to cover other claims then asserted by libellant in connection with shipments on other Shipping Board vessels, including the shipment on

the SS West Eldara described in the libel herein.

"As a result of said negotiations, the libellant agreed to accept, and the respondents agreed to pay to the libellant the sum of $17,500.00 in full settlement of all claims then and theretofore considered and all other claims of the libellant against the respondents, with the exception of any claims that libellant might have against the Atlantic Gulf & Pacific Steamship Company. Pursuant thereto, the libellant duly presented its invoice, and executed, on or about May 4, 1923, a public voucher, copies of which are hereto attached as Exhibit A, and further executed under its corporate seal, by authority of its Board of Directors, on or about the 29th day of May, 1923, a release, copy of which is hereto attached as Exhibit B, both of which instruments were thereafter duly delivered by libellant to the respondents, and on or about the 11th day of June, 1923, there was paid to the libellant by respondents the said sum of $17,500.00.

"XVI. The filing of said invoice, the execution by libellant of said voucher and release and the acceptance by libellant of said payment, pursuant to the agreement theretofore made between the parties, constituted a full, complete and executed accord and satisfaction of all claims in favor of libellant against the respondents set forth in the libel herein."

The release around which this controversy is centered is in the following words and figures, to wit:

"Know ye, that the Southern Cotton Oil Company, a corporation organized and existing under and by virtue of the laws of the State of New Jersey, and having its principal office and place of business at No. 120 Broadway, New York City, New York, for and in consideration of the sum of Seventeen Thousand Five Hundred Dollars ($17,500.00), lawful money of the United States of America, to it in hand paid by the United States Shipping Board Emergency Fleet Corporation, the receipt whereof is hereby acknowledged, has remised, released and forever discharged and does by these presents for itself, its successors and assigns and each of them, release and forever discharge the said United States Shipping Board, the United States Shipping Board Emergency Fleet Corporation, and the United States of America, the South Atlantic Maritime Corporation, their successors and assigns, and each of them, the several steamships of said companies, and of said United States Shipping Board and of the said United States of America, their officers and crews, their heirs, executors and administrators and assigns, and in particular the Steamship Nonantum, her owners, agents, charterers, underwriters, master, officers and crew of and from all, and all manner of actions, suits, liens, duties, dues, trespasses, damages, injuries, sums of money, controversies, agreements, judgments, executions, claims and demands, whatsoever, whether at law or in admiralty, which against any or all of the aforesaid parties or against any steamships or any agent or person connected therewith, it ever had, now has, or which its successors or assigns hereafter can, shall or may have, upon or by reason of any matter, cause, or thing, whatsoever, from the beginning of the world to the day of the date of these presents provided, however, that there is expressly reserved from this release and nothing herein shall be construed as affecting any and all claim or claims against the Atlantic, Gulf & Pacific Steamship Corporation for loss and shortage of cargo.

"In witness whereof, the Southern Cotton Oil Company has executed this instrument this 29th day of May, in the year one thousand and nine hundred and twenty three."

In view of the issue thus raised challenging the right of libelant to proceed further in this action, a hearing was had and a formal order was entered confining the issues presented by the respondents' answer, as amended by their supplemental and amended answer, to the sufficiency of the compromise and release, and to a determination of whether or not same is a bar to this libel and constitutes a full and complete satisfaction, compromise, and release of the claims of libelant as set forth in the libel herein.

The contention of the respondents has already been stated. The libelant contends (1) that the release on its face is special and does not embrace the West Eldara claim; (2) particularly when read in the light of the circumstances surrounding its execution; (3) that if the release is not on its face special, it is ambiguous and the testimony establishes that the parties did not intend to include the West Eldara claim; (4) that, if construed as embracing the West Eldara claim, such claim was

included in the release by mistake; and (5) if construed as embracing the West Eldara claim, the release in no way affects the claim or interest of the Yokohama Fire & Marine Transit & Fidelity Insurance Company, Limited.

The testimony in this case shows that libelant's district traffic manager, Gaillard, handled all of the claims in controversy. It further appears that he received the complete file of the claim in the West Eldara case in September, 1922, and that on the last day of October he wrote to the officer of the company in New York from whom he had received the file, in part as follows:

"I have only just had opportunity of carefully examining the very voluminous file on SS West Eldara which brought peanuts from Japan to The Southern Cotton Oil Co., Savannah.

"While there is no legal liability, as has formerly been stated by our counsel, there is some chance, I believe, of getting money out of the shipping board taking into consideration their present policy.

"The claim that I intend filing against them will be somewhat in the neighborhood of $200,000.00. How much of this I will recover, or have any idea that I will recover, I cannot say, but believe we will get some of it back."

Thereafter, on November 10, 1922, Gaillard wrote Proom, head of P&I Section, United States Shipping Board, with a copy to Gehan, head of Claims Division of the Traffic Department of the Shipping Board, as follows:

"Following my conference in Washington several weeks ago with you and Mr. Gehan with reference to our claim of $46,968.99 against the Steamer Nonantum, we have decided to consolidate our claims under one cover for the Board's consideration, and attach hereto memoranda and documents showing claims against Steamers with the amounts as follows:

| | | |
|---|---|---:|
| Steamer Nonantum | | $ 46,968.99 |
| " | West Cobalt | 2,250.00 |
| " | Lake Fostoria | 380.20 |
| " | " Helen | 220.20 |
| " | West Eldara | 196,283.58 |
| " | Chattanooga (Cannot be definitely determined) | |
| " | Shotter's Island (Compromised and settled) | |
| Total | | $246,103.05 |

"You will note from the foregoing figures that our actual monetary loss amounted to $246,000.00. To this should be added an estimated amount of $50,000.00 to cover damages against the Steamer Chattanooga, making a conservative tabulation of our loss approximately $300,000.00.

"Each memorandum explains as briefly as possible our claim against that particular steamer. It can readily be seen what embarrassment, inconvenience and loss we suffered as a result of utilizing these vessels. One mishap after another in rapid succession not only cost us heavy monetary loss but practically ruined our business and prestige in South America.

"While there is perhaps some doubt as to Shipping Board liability we believe that it is not their policy to pass unnoticed such excessive losses as were suffered by The Southern Cotton Oil Co. in their endeavor to patronize The American Merchant Marine. We have no idea of changing our policy of shipping on Board vessels, yet there is ever present the feeling of uncertainty and fear that what has happened in the past may again occur and with these unmitigated losses as a reminder we confess there is at times a temptation on the part of our Foreign Department not to utilize Shipping Board vessels in their foreign business.

"With these thoughts in mind, and calling your attention to the fact that some of our losses will shortly be barred by the Statute of Limitations as far as the entering of suit is concerned, we respectfully submit our claims for the Board's consideration."

It is not disputed or denied that this letter correctly sets forth the understanding that was arrived at on the occasion of the conference in Washington, nor does the libelant contend that its representative ever acted counter to this agreement and understanding. What the libelant does say is that the government subsequently refused to treat with this claim of the West Eldara because the vessel was in the hands of general average adjusters, and it is around this factual issue that the principal argument is centered.

To analyze all of the testimony, both oral and written, that bears on this issue and the other issues which this case presents would prolong this opinion to undue length and would serve no useful purpose. I take it that it is important only that I

state the ultimate facts upon which the decision in this case must rest.

Libelant's sole witness, testifying more than ten years after the occurrence and under circumstances which may be characterized as unusual, asserted that the government did not intend to include the West Eldara claim in the settlement, and Proom's memory after the same lapse of years was finally refreshed to the extent that he seemed to agree therewith. However, the contemporaneous writings which are in evidence, and which includes two interoffice memorandums written by Proom, clearly indicates that the contrary view is the one that should be adopted. In this connection it is well to bear in mind that in these settlement negotiations Proom and Gehan were working under the supervision of Keene who was the director of traffic for the fleet corporation. It will be of interest, therefore, to note what these witnesses had to say on the subject, apart from their general statements that the settlement was for all claims and included the claim of the West Eldara. Keene stated that the Traffic Department, with the approval of the board of trustees, could conduct settlement negotiations if the vessel was in the hands of general average adjusters; furthermore, that he did not recall that the general average feature played a very important part in the negotiations. Gehan was also of the opinion that there was no prohibition against including a general average claim in a general settlement. Furthermore, it is stipulated in this case that the steamship Nonantum was in general average at the time of the execution of this release.

■ Considering the testimony as a whole, and there is other relevant testimony, I am persuaded that the minds of the parties met and that what they agreed upon was a monetary basis for the settlement of all claims asserted by libelant as arising out of the operation of vessels through the United States Shipping Board, including the claim of the West Eldara and excepting only loss and shortage claims against the Atlantic Gulf & Pacific Steamship Corporation. Accordingly, it must be held that the execution by libelant of said voucher and release, and the acceptance of the payment which was made pursuant to this agreement, constitute a full and complete satisfaction, compromise, and

release of the claims which libelant asserts in its own right in the libel herein.

■ Libelant, however, is here suing not only in its own behalf, but on behalf of the Yokohama Fire & Marine Transit & Fidelity Insurance Company, Limited, who were the underwriters on this shipment of shelled peanuts, and it is urged that the special defense of release in no way applies to said insurance company. Libelant claims that respondents knew that it had insurance which covered it against marine perils with respect to particular and general average, and accordingly they were charged with knowledge that the insurance company as subrogee had acquired a right of action which they had no right to cancel.

No witness having the prerequisite knowledge has stated any facts showing the right of the underwriter to stand in judgment, nor has the policy of insurance been produced. The only evidence in this record which tends to show that respondents knew that libelant had insurance which covered it with respect to particular average is to be found in an excerpt from a letter from Keene to Love, in which the former made the uncertain hearsay statement, "I believe the Southern Cotton Oil Company obtained some thirteen thousand in settlement of particular average insurance."

With reference to the general average feature, the situation is somewhat different, as the respondents knew that the whole cargo was in general average and in the hands of Wilcox, Peck & Hughes, average adjusters. However, respondents' mere knowledge that the insurance company was paying the general average charges would not charge respondents with knowledge that this insurance company had any liability for or was in any way interested in any damages to this shipment in respect of which they would be subrogated against the respondents. Nor does it charge them with knowledge that the policy covered particular average for the reason that it is not unusual for policies on perishable cargoes to be written "Free of Particular Average" while the underwriter is at the same time liable for general average charges. Furthermore, the evidence does not show that the insurer by its policy became obligated to pay and did pay any amount to the assured on account of its damage and loss in re-

spect of which it became subrogated to the rights of its assured against respondents.

A decree may accordingly be entered in favor of respondents dismissing the libel, with costs.